**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELWARE**

| | |
|---|---|
| JACK GUTTMAN, Derivatively on Behalf of Nominal Defendant AUTODESK, INC.,<br><br>Plaintiff,<br><br>v.<br><br>KAREN BLASING, REID FRENCH, AYANNA HOWARD, BLAKE IRVING, MARY MCDOWELL, STEPHEN D. MILLIGAN, LORRIE M. NORRINGTON, ELIZABETH RAFAEL, RAMI RAHIM, and STACY J. SMITH,<br><br>Defendants,<br><br>and<br><br>AUTODESK, INC.,<br><br>Nominal Defendant. | C.A. No.<br><br><br><br>**JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

By and through his undersigned counsel, Plaintiff Jack Guttman ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Autodesk, Inc. ("Autodesk" or the "Company") and against certain current and former officers and directors of the Company for: (i) violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duty; (iii) and misappropriation of information; (iv) unjust enrichment; (v) abuse of control; (vi) gross mismanagement; (vii) and waste of corporate assets. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public

filings made by Autodesk and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Autodesk's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Barkasi v. Autodesk, Inc., et al.*, Case No. 4:24-cv-02431-YGR (N.D. Cal.) (the "Related Securities Action"); and (e) review of other publicly-available information concerning Autodesk and the Defendants.

## I. NATURE OF THE ACTION

1. Plaintiff brings this action derivatively for the benefit of Nominal Defendant Autodesk against certain of the Company's current and former executive officers and directors aiming to rectify the Defendants' breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately February 23, 2023 to the present (the "Relevant Period").[1]

2. Autodesk is a software design company that generates most of its revenue through the sale of software subscriptions. The size and nature of the Company's subscriptions vary to address the specific needs of its customers, which hail from a variety of industries. The Company's most expansive subscription offerings are its Enterprise Business Arrangements ("EBAs"), which provide "token-based access to a broad pool of Autodesk products." EBAs are

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately February 23, 2023 to April 16, 2024, however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

sold ***directly***[2] by Autodesk to large customers, representing its largest deals. The Company separately offers customers the ability to purchase subscriptions for individual products or for smaller groups of products, to which it typically refers to as its product subscriptions. The Company's product subscriptions are sold ***indirectly*** through distributors and resellers.

3. The Company has historically sold many of its enterprise and product subscriptions through multiyear contracts with three-year terms. The Company told investors its EBA deals were typically billed on an annual basis, but its product agreements were billed "upfront" – at the start of a three-year term – rather than annually. The Company's annual and upfront billing models had very different impacts on the Company's free cash flow metric – a critical financial metric for Autodesk. Defendants emphasized and encouraged investors to place great weight on free cash flow in evaluating the Company's performance. Financial analysts also stressed the importance of the Company's free cash flow, using it in their financial modeling.

4. However, the Company's upfront billing model presented difficulties for Autodesk. First, it required the Company to offer discounts to induce the large upfront payments, reducing overall revenue and profitability. Second, it created inconsistency in the Company's cash flow on a year-to-year basis because the Company received free cash flow from a multiyear contract ***only*** in the year it was collected. The upfront billing model thus created more volatility in the Company's cash flow and less clarity in its financial forecasting.

5. Accordingly, prior to the start of the Relevant Period, the Company told the investing community it would transition almost entirely to the annual billing model, which was better for Autodesk's long-term success.

---

[2] All emphasis has been added, unless otherwise indicated.

6. At the Company's earnings call for the second quarter of fiscal year 2022 ("2Q22") on August 25, 2021, Defendants announced they would transition the small remaining group of EBA customers that still had upfront deals to the annual billing model by the start of fiscal year 2023 ("FY23") (starting February 1, 2022).[3] Defendants stated the impact of this change would be "modest" – around 1% impact of total billings for fiscal year 2022 ("FY22") – which analysts estimated as approximately $50 million. Defendants' representations led the market to believe that, after February 1, 2022 (the start of FY23), all EBA customers would be on annual billing terms, clarifying free cash flow in future years.

7. A week later, at the Company's FY22 investor day, Defendants announced that, after the EBA transition, they would transition product subscriptions to the annual billing model. Defendants explained that the product subscription transition would take place on a slower timeline because it would take time to bring reseller partners on board and to develop the back-office functionality needed to handle the increased volume of annual billing. Defendants later told investors that the go-live date for this transition would be March 27, 2023, at which point the vast majority of its customers would be on the annual billing model.

8. Through the remainder of FY22 and during FY23, Defendants continued to update the market on the progress of its product billing model transition and emphasize the import of this change to its business. Defendants repeatedly told investors they wanted this product transition done as quickly as possible and emphasized switching to the annual billing model would provide more predictable cash flow and more profitable pricing. However,

[3] Throughout the Relevant Period, the Company used a financial reporting structure in which each fiscal year ended on January 31 of the corresponding calendar year; for example, FY23 ended on January 31, 2023. Likewise, 1Q23 ended on April 30, 2022, 2Q23 ended on July 31, 2022, and 3Q23 ended on October 31, 2022. As a result of this structure, most of a given fiscal year occurs in the preceding calendar year: for example, 11 months of FY23 occurred in calendar year 2022.

unbeknownst to investors, as the Company discussed the transition of ***product*** customers to annual billing, the Company reversed course on its announcement about transitioning all ***EBA*** customers to annual billing. Instead of ending EBA upfront deals and associated discounting, in FY23 the Company actively pursued and incentivized customers to accept ***upfront*** EBA deals with discounts in quantities that ***substantially exceeded historical levels*** to help the Company ***meet its free cash flow target***, as the Company later ***admitted***.

9. On February 23, 2023, the first day of the Relevant Period, Defendants reported the Company's financial results for the fourth quarter of 2023 ("4Q23") and FY23. The Company announced free cash flow had increased to $2.03 billion, which supposedly beat the lower end of its guidance and provided guidance for fiscal year 2024 ("FY24"), but these statements were misleading. Defendants failed to disclose that the FY23 free cash flow and FY24 cash flow guidance were inflated by these upfront EBA deals, which would necessarily cause a larger hole in future cash flow than the market had been led to believe.

10. On May 25, 2023, the Company announced its results for the first quarter of FY24 ("1Q24"), stating it had "***record*** first quarter free cash flow," representing 60% of the cash flow it had told the market to expect for FY24. Defendants told the market the Company's "record" results were due in part to "cash collections from the last month of billings" in FY23 but failed to disclose that they included $200 million in upfront deals that would not recur in future years, which masked the material negative impact the FY23 EBA upfront deals had on FY24 free cash flow. Moreover, Defendants concealed that the Company's supposed record results contained EBA upfront free cash flow, despite having told investors such deals were retired.

11. Defendants continued to provide misleading cash flow guidance and misrepresent the true nature of the Company's EBA agreements and the state of its billing model transition.

Defendants' deceptive statements and omissions had the intended effect of inflating the Company's stock price throughout the Relevant Period.

12. The truth regarding Defendants' fraud began to emerge on November 21, 2023, when the Company announced its results for the third quarter of FY24 ("3Q24"), reporting its ***lowest quarterly free cash flow in more than five years***, and shocked investors by telling them to remove $200 million as they modeled free cash flow in the following year caused by upfront deals that would not recur. As a result of this news, the Company's analysts viewed the Company's stock value with substantially less optimism, and Autodesk's stock price plummeted by almost 7% on November 22, 2023.

13. On April 1, 2024, after the market closed, investors continued to learn the true extent of Defendants' fraud when the Company announced it had to delay the filing of its annual report on Form 10-K – an SEC-mandated filing – due to a previously undisclosed internal investigation by the Company's Audit Committee regarding the Company's free cash flow and non-operating GAAP margins.[4] This again surprised the market, causing Autodesk's stock price to decline by over 4% the following day.

14. Thereafter, on April 16, 2024, the Company announced it expected to receive a delinquency notice from Nasdaq regarding the delayed filing of its annual report and needed additional time to complete its investigation, raising further concern about the Company's business and causing the stock price to fall again by almost 6%.

15. Following the close of the Relevant Period, on May 31, 2024, the Company finally announced the findings of its Audit Committee investigation, which it buttressed with

[4] Generally Accepted Accounting Principles ("GAAP") are a set of accounting rules, standards, and procedures issued and frequently revised by the Financial Accounting Standards Board and the Governmental Accounting Standards Board.

optimistic projected numbers for the future to blunt the impact of the findings. The Company also disclosed that its Chief Financial Officer ("CFO"), Deborah L. Clifford ("Clifford"), who had served at the financial helm of Autodesk during the fraud, had been demoted to a role that had no responsibility for the Company's financial reporting.

16. The Audit Committee's findings included key ***admissions*** that made clear Defendants had ***intentionally*** engaged in practices to inflate free cash flow in FY23, including, but not limited to:

- "During fiscal year 2022, the Company announced that it had begun to shift enterprise customers to contracts billed annually, and that it had assumed fiscal 2023 enterprise contracts would be billed annually";
- Despite that announcement, "[t]he Company subsequently determined… to pursue multiyear upfront contracts with enterprise customers to help meet its fiscal year 2023 free cash flow goal";
- As a result, "[u]pfront billings of enterprise customers in fiscal year 2023 ***substantially exceeded historical levels***, helping the Company to ***meet its lowered annual free cash flow target***"; and
- The Company also made "decisions regarding discretionary spending, collections, and accounts payable [that] were ***informed by their anticipated effects on the Company's external free cash flow and/or non-GAAP operating margin targets.***"

17. As Autodesk investor Starboard Value LP ("Starboard"), an investor that owned $500 million in Autodesk stock, stated in a public letter in the wake of these findings:

> ***This was a clear case of a company saying one thing to investors and doing something completely different***. Autodesk had an obligation to not mislead investors with its public commentary, but instead of honoring this obligation, Autodesk did the opposite – ***the Company told investors it was at the tail-end of a process to move enterprise customers to annual billings . . . . The Company continued to report these free cash flow results with multi-year, upfront billings while explicitly and implicitly leading shareholders to believe they had moved enterprise customers to annual billings***.

18. The unraveling of Defendants' fraud caused significant declines in the Company's stock price, causing the Company and investors to suffer substantial losses. At the same time,

Defendants profited from their fraud through incentive compensation tied to the Company's achievement of free cash flow targets.

## II. JURISDICTION AND VENUE

19. This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

20. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

21. Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## III. PARTIES

### A. Plaintiff

22. Plaintiff was a shareholder prior to the start of the Relevant Period, is currently, and has continuously been, a holder of Autodesk common stock.

### B. Nominal Defendant

23. Nominal Defendant Autodesk is incorporated in Delaware and its current principal executive offices are located at One Market Street, Suite 400, San Francisco, California 94105. The Company's common stock trades on the Nasdaq Global Select Market (the "NASDAQ") under the ticker symbol "ADSK."

### C. Defendants

24. Defendant Andrew Anagnost ("Anagnost") has been the Company's President and Chief Executive Officer ("CEO") as well as a member of the Company's Board of Directors (the "Board") since June 2017. For the fiscal years of 2023 and 2024, Defendant Anagnost received $17,600,752 and $20,649,951 in total compensation,[5] respectively. Defendant Anagnost is named as a defendant in the Related Securities Action.

25. Defendant Clifford served as the Company's CFO from April 19, 2021 until May 31, 2024. For the fiscal years of 2023 and 2024, Defendant Clifford received $4,568,422 and $6,372,578 in total compensation, respectively. Defendant Clifford is named as a defendant in the Related Securities Action.

26. Defendants Anagnost and Clifford are collectively referred to herein as the "Securities Action Defendants."

27. Defendant Karen Blasing ("Blasing") has been a member of the Company's Board since 2018. Defendant Blasing is a member of the Audit Committee. For the fiscal years of 2023 and 2024, Defendant Blasing received $336,589 and $339,992 in total compensation, respectively.

28. Defendant Reid French ("French") has been a member of the Company's Board since 2017. Defendant French is the Chair of the Audit Committee. For the fiscal years of 2023 and 2024, Defendant French received $340,002 and $339,992 in total compensation, respectively.

29. Defendant Ayanna Howard ("Howard") has been a member of the Company's Board since 2019. Defendant Howard is a member of the Audit Committee. For the fiscal years

[5] Includes salary, stock awards, option awards, non-equity incentive plan compensation and all other compensation.

of 2023 and 2024, Defendant Howard received $330,596 and $324,962 in total compensation, respectively.

30. Defendant Blake Irving ("Irving") has been a member of the Company's Board since 2019. Defendant Irving is a member of the Compensation Committee as well as a member of the Corporate Governance Committee. For the fiscal years of 2023 and 2024, Defendant Irving received $340,002 and $339,962 in total compensation, respectively.

31. Defendant Mary McDowell ("McDowell") has been a member of the Company's Board since 2010. Defendant McDowell is the Chair of the Compensation Committee. For the fiscal years of 2023 and 2024, Defendant McDowell received $364,006 and $364,067 in total compensation, respectively.

32. Defendant Stephen D. Milligan ("Milligan") has been a member of the Company's Board since 2018. Defendant Milligan is a member of the Audit Committee. For the fiscal years of 2023 and 2024, Defendant Milligan received $340,002 and $339,992 in total compensation, respectively.

33. Defendant Lorrie M. Norrington ("Norrington") has been a member of the Company's Board since 2011. Defendant Norrington is the Chair of the Corporate Governance Committee. For the fiscal years of 2023 and 2024, Defendant Norrington received $351,952 and $352,030 in total compensation, respectively.

34. Defendant Elizabeth Rafael ("Rafael") has been a member of the Company's Board since 2013. For the fiscal years of 2023 and 2024, Defendant Rafael received $349,909 and $349,962 in total compensation, respectively.

35. Defendant Rami Rahim ("Rahim") has been a member of the Company's Board since 2022. Defendant Rahim is a member of the Compensation Committee. For the fiscal years

of 2023 and 2024, Defendant Rahim received $106,330 and $291,996 in total compensation, respectively.

36. Defendant Stacy J. Smith ("Smith") has been a member of the Company's Board since 2011. Defendant Smith is a member of the Corporate Governance Committee. For the fiscal years of 2023 and 2024, Defendant Smith received $429,992 and $430,085 in total compensation, respectively.

37. Defendants Anagnost, Blasing, French, Howard, Irving, McDowell, Milligan, Norrington, Rafael, Rahim, and Smith are collectively referred to herein as the "Director Defendants."

38. The Director Defendants, along with the Securities Action Defendants, are collectively referred to herein as the "Individual Defendants."

39. The Individual Defendants, along with Autodesk are collectively referred to herein as the "Defendants."

**D. Related Party Non-Defendants**

40. Related Party Non-Defendant John Cahill ("Cahill") has been a member of the Board of Directors since December 18, 2024. Cahill is named solely for the purpose of demand futility.

41. Related Party Non-Defendant Ram Krishnan ("Krishnan") has been a member of the Board of Directors since December 18, 2024. Krishnan is named solely for the purpose of demand futility.

## IV. FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

42. By reason of their positions as officers, directors, and/or fiduciaries of Autodesk, and because of their ability to control the business and corporate affairs of Autodesk, the

Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Autodesk in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Autodesk and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

43. Each director and officer of the Company owes to Autodesk and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

44. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Duties of the Members of the Audit Committee**

45. Pursuant to the Audit Committee Charter of Autodesk (as of March 2022)[6], the purpose of the Audit Committee is to:

> Assist the Board in fulfilling its oversight responsibilities by reviewing the Company's financial reporting, the systems of internal controls, the audit process, and the independent auditor's qualifications, independence, and performance.
>
> The Committee's responsibility is one of oversight. The members of the Committee are not employees of the Company, and they do not perform, or represent that they perform, the functions of management or the independent auditors. The Committee relies on the expertise and knowledge of management, Audit and Advisory Services, and the independent registered public accounting

[6]Available at https://investors.autodesk.com/static-files/f5454d35-ba06-4de7-8ele-d6dca49d8 e66.

> firm in carrying out its oversight responsibilities. Company management is responsible for preparing accurate and complete financial statements in accordance with generally accepted accounting principles ("GAAP") and for establishing and maintaining appropriate accounting principles and financial reporting policies and satisfactory internal control over financial reporting.

46. In addition, the Audit Committee Charter sets forth the following responsibilities, among others:

> Review with management and the independent auditors the Company's financial statements, including disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), prior to the filing of the Company's Annual Report on Form 10-K. Discuss with the independent auditors their judgment about the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments, and the clarity and completeness of the disclosures in the financial statements. Discuss with the independent auditors critical audit matters ("CAM") and related CAM disclosures.
>
> * * *
>
> Review the interim financial statements, including the Company's disclosures under MD&A, prior to the filing of the Company's quarterly reports on Form 10-Q as well as the results of the quarterly review and any other matters required to be communicated to the Committee by the independent auditors.
>
> * * *
>
> Review earnings press releases and review and discuss with management policies with respect to earnings press releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information, and earnings guidance provided to the public, analysts, and ratings agencies.
>
> * * *
>
> Submit for inclusion in the Company's annual Proxy Statement the audit committee disclosures required by the SEC and Nasdaq Rules, including the Audit Committee Report and the confirmation of the existence of a written charter, and confirm to the Board the independence and financial literacy of Committee members.
>
> * * *
>
> Discuss and review the Company's critical accounting policies and key internal accounting controls and procedures.

* * *

> Oversee compliance by the Company with regard to establishing and maintaining an adequate system of internal controls over financial reporting and disclosure controls and procedures.
>
> Establish and oversee compliance by the Company with the procedures for handling complaints regarding accounting, internal accounting controls, or auditing matters, including procedures for confidential, anonymous submission of concerns by employees regarding accounting and auditing matters.

* * *

> Oversee the management of risks associated with the Company's financial reporting, accounting and auditing matters.

47. Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Duties Pursuant to the Company's Code of Business Conduct**

48. The Individual Defendants, as officers and/or directors of Autodesk, were also bound by the Company's Code of Business Conduct[7] (the "Code") which, according to the Code, sets out basic principles to guide all directors, officers, and employees of Autodesk, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

49. The Code opens with a message from Defendant Anagnost, stating "Our success is built on our foundational commitment to **doing what's right** for our colleagues, our

[7]Available at https://investors.autodesk.com/static-files/85a4c65c-781b-4748-84f4-ccbfadd55685.

customers, our company, our communities, and all our stakeholders. Doing what's right means that we always act honestly and with the highest ethical standards" (emphasis in original).

50. Regarding the accuracy of business records, the Code states: "Making good business decisions, fostering our shareholders' trust, and meeting our legal obligations as a public company all require us to keep complete and accurate records of our transactions and business information."

51. Concerning insider trading, the Code states:

> Through your work, you may have access to material, non-public information about Autodesk, a customer, or another third party. This is considered "inside information." Trading Autodesk securities or any other company's securities while aware of inside information is insider trading. Insider trading is illegal and violates company policy.
>
> Do not buy or sell securities while you are aware of inside information (i) Do not recommend that anyone else trade in the securities of a company while you are aware of its inside information (even if you do not share the information itself) (ii) Do not share non-public or confidential information you acquire through your work at Autodesk with anyone without appropriate authorization (iii) Do not trade Autodesk securities while the trading window is closed if you are subject to the trading windows described in our Insider Trading Policy (iv) Consult your Legal Business Partner before you trade public securities if you have any questions about whether you may be in possession of inside information.
>
> Information is "material" if a reasonable investor would consider it important in deciding whether to buy or sell that company's securities. Information is "nonpublic" if it has not been broadly communicated to the investing public.

52. Concerning ethical/honest conduct and fair dealing in regard to customers and others, the Code states:

> Delivering on that commitment requires that our relationships with each other be founded on trust and respect, which we must earn every day by always adhering to the highest standards of ethical business conduct.
>
> Doing what's right requires that managers "create an ethical culture and environment where team members feel comfortable raising concerns."

> We build trust with our customers by competing fairly and honestly on the merits of what we have to offer. We win business by delivering the products and services that allow them to imagine, design, and bring their ideas to life.
>
> Everything we say about Autodesk can impact Autodesk's reputation and brand. We are thoughtful and use good judgment when communicating externally about Autodesk, including in social media. To ensure that our communications are consistent, accurate, and comply with the law, only certain people are authorized to speak on behalf of Autodesk.

53. Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

54. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Autodesk, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Autodesk.

55. Because of their advisory, executive, managerial, and directorial positions with Autodesk, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Autodesk.

56. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Autodesk and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

57. To discharge their duties, the officers and directors of Autodesk were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Autodesk were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Autodesk conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Autodesk was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V. BREACHES OF DUTIES

58. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Autodesk and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Autodesk, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Autodesk, the absence of good faith on their part, and a

reckless disregard for their duties to Autodesk and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Autodesk.

59. The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

60. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Autodesk has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## VI. CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

63. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust

enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

64. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## VII. SUBSTANTIVE ALLEGATIONS

### A. Background of the Company

66. Autodesk provides a wide range of software tools to meet the varied needs of its customers in a host of industries, including architecture, engineering, construction, product design, manufacturing, media, and entertainment. The Company generates most of its revenue through its sale of subscriptions to its software products. The size and nature of the subscriptions the Company offers vary based on the specific needs of its customers. The Company offers EBAs that provide "token-based access to a ***broad pool*** of Autodesk products." The Company separately offers customers the ability to purchase subscriptions for ***individual*** products or for ***smaller*** groups of products, to which it typically refers as its product subscriptions.

67. The Company's subscriptions often have three-year terms, resulting in the formation of groups of deals that renewed at the same time, known as "cohorts." For example, a group of deals renewed in fiscal year 2020 that would be up for renewal again in FY23 would be a "cohort."

68. The Company sells its subscriptions through two channels: direct and indirect.

### 1. The Direct Sales Channel

69. The "direct" sales channel consists of large customers that enter into EBAs with the Company. EBAs are "direct" because Autodesk personnel communicate directly with EBA customers to make sales, rather than selling through intermediaries. The Company has stated EBA deals are seasonal: "[H]istorically, we have had increased EBA sales activity in our fourth fiscal quarter . . .."

70. According to the Company, for EBA customers, payments were ***typically*** made through an annual billing model – payments due in annual installments over the contract term.

71. To illustrate, if an EBA customer agreed to pay $300 million in December 2022 to use the Company's software for three years, with ***annual*** payments, the Company would receive $100 million in payments in the fourth quarter of FY23 (which ends on January 31, 2023) and two more payments of $100 million – one in the fourth quarter of FY24 ("4Q24"), and the final one in the fourth quarter ("4Q25") of fiscal year 2025 ("FY25").

72. However, prior to the start of the Relevant Period, not all of the Company's EBAs were on the annual billing model. As detailed below, according to the Company, a very small percentage – less than 1% of its billings – were EBA deals signed under the Company's "upfront billing model," where EBA customers' payment for their three-year subscription was made

upfront (at year one) in return for a discount. This was the model used by Autodesk's product customers as discussed below.

### 2. The Indirect Sales Channel

73. The Company sold its product subscriptions through an "indirect" channel of "partners" consisting of "approximately 1,500 resellers and distributors" that sold them to end users.

74. The Company's billing model for the indirect sales channel differed from its annual billing model typically employed for EBAs. The Company typically allowed the resellers to use an upfront model, charging the end customers the entire three-year cost of the three years' worth of software at the start of the subscription. To motivate resellers' end users to pay for three years' worth of software at the inception of the term, the Company reported that it used incentive programs and promotions in its reseller channel, typically consisting of discounts of up to 10%. The Company would collect the upfront payment from the resellers, minus some amount to compensate the resellers for their services.

75. The Company's indirect channel partners used an upfront billing model because, unlike the large EBA customers, the Company reported its channel partners were typically not highly capitalized, meaning they do not maintain much cash on hand and liked receiving the cash infusion upfront.

## B. The Company's Two Billing Models Had Dramatically Different Impacts on Its Reported Free Cash Flow – a Critical Metric

76. Free cash flow is a critical metric for Autodesk. It reflects the cash the Company generates after accounting for cash outflow to support its operations and capital expenditures. As the Company put it in reporting this number publicly, the free cash flow metric, among other non-GAAP metrics, gave investors "***greater transparency*** with respect to ***key metrics*** used by

management in its financial and operational decision-making." The Company understood its free cash flow metrics, among other non-GAAP metrics, were "***used by Autodesk's institutional investors and the analyst community*** to help them analyze the health of the Company's business." Defendants repeatedly emphasized and encouraged investors to place great weight on free cash flow in evaluating the Company's performance. As detailed below, financial analysts also stressed the importance of the Company's free cash flow, using it in their financial modeling.

77. The Company's annual and upfront billing models had very different impacts on the Company's reported free cash flow. The Company's upfront billing model allowed for an infusion of cash when deals were inked but typically required the Company to provide a discount to customers of up to 10%, making such deals less profitable. Additionally, upfront deals created less clarity in forecasting over time. The Company's annual billing model did not require discounts, making it more profitable, and represented a more predictable stream of payments that allowed the market and securities analysts to better value the Company's stock.

78. The following example illustrates the impact that "annual" and "upfront" billing models have on the Company's reported free cash flow. A $300 million upfront deal with a 10% discount (to induce the customer to pay for three years' worth of software at its inception) would thus result in $270 million in cash collected upfront ($300 million minus $30 million discount (10%)) and reported at the time of collection but no additional payments for the next two years. Under the annual billing model, the Company would collect $300 million in cash (no discount required) paid in three annual payments of $100 million each year, and the Company would report $100 million in free cash flow for each of the three years. This illustration shows how the two transactions have dramatically different impacts on the timing and amount of free cash flow.




79. This illustration demonstrates that an upfront deal would appear to have a dramatically better impact on Autodesk's 4Q23 free cash flow than a corresponding annual deal, but the Company would receive no free cash flow from that deal in FY24 and FY25, to which the Company referred as "out" years. However, an annual deal provides better cash flow in FY24 and FY25, as well as more predictable cash flow and profitability over the longer term. Under the upfront billing model, after FY23 ends, the Company needs to find a lot more customers, make bigger deals, or both, just to report the ***same*** free cash flow in FY24 and FY25 as reported in FY23. An annual deal also provides more total cash flow because no discount is needed. In short, as Anagnost put it, "upfront billing is the biggest piece of volatility in our free cash flow."

80. Throughout the Relevant Period, Defendants repeatedly told the market the annual billing model was better for Autodesk's long-term success.

### C. The Company Announces the End of Its Upfront Billing Model

81. In late 2021, the Company told investors it was transitioning its customers from the upfront billing model to the annual billing model, which, as Clifford explained, was "good for [customers] and good for Autodesk," and that, under the annual billing model, "we expect . . . to drive more predictable free cash flow growth and better price realization over time, which will make Autodesk a more valuable company."

82. The Company explained it would undertake this transition in two steps: (a) eliminate remaining upfront deals with EBA customers; and (b) transition all product customers to the annual billing model.

83. ***First***, in August 2021, Defendants told investors that while it had made very few upfront deals with EBA customers – amounting to just 1% of overall billings – it had decided to bring that 1% down to 0%, with that minor change being complete within months. This was easy for the Company to do because, as noted, it sold software directly to EBA customers and simply needed to stop offering any of those customers upfront deals.

84. ***Second***, in September 2021, Defendants announced the Company would also end upfront deals with its indirect sales channel for product subscriptions. However, Defendants noted this transition would take more time to complete than the transition with EBA customers because the Company's indirect sales partners needed more time to transition, and the Company needed to make some back-office changes to manage the scale of moving all its product resellers to annual billing.

85. On August 25, 2021, the Company held an earnings call for 2Q22, during which it announced its transition of the remaining EBA customers to the annual billing model. The Company's CFO, Clifford, stated:

> Our strong start to the year means ***we're also shifting more of our EBA customers from multiyear paid upfront to annual billings***, which is good for them and good for Autodesk. Our EBA customers retain price certainty with a multiyear contract term, but ***annual billings give them a more predictable annual cash outlay***.
>
> For Autodesk, ***we generate more predictable cash flow and remove the discounts to generate upfront cash collections. While we had already assumed this change in fiscal '23, it has a modest impact on fiscal '22 billings and free cash flow***. However, ***we expect it to drive more predictable free cash flow growth and better price realization over time, which will make Autodesk a more valuable company***.

86. Here, Defendants conveyed to investors that the Company was already ending upfront deals for EBA customers and there would be no more upfront EBA deals as of February 1, 2022, which was the start of FY23.

87. Moreover, given that most of the Company's EBA customers were already on the annual billing model, Clifford explained the transition of EBA contracts to this model ***would not*** have a significant impact on the Company's billing guidance, stating: "[T]he impact to our billings guidance is also pretty small. It's around ***1 percentage point of impact*** to the total billings." On August 26, 2021, based on Clifford's statement, analysts who followed the Company, including Berenberg Equity Research and Deutsche Bank Securities Inc., estimated remaining EBA deals comprised $50 million of the Company's billings.

88. The Company's announcement that the transition of remaining EBA upfront deals to the annual billing model would only have 1% point of impact to total billings had special significance. It conveyed to the market that the vast majority of EBA deals were ***always*** on the annual billing model and that only a tiny quantity of EBA deals remained on upfront terms, which would be transitioned by February 1, 2022; thus, EBA upfront deals would no longer result in a headwind to future cash flow.

89. The following week, on September 1, 2021, Autodesk held an investor day call, on which it continued to discuss its movement away from the upfront billing model. There, Clifford reiterated Autodesk's continued movement of EBA customers to an annual billing model, stating: "[A]t our earnings call ***last week*** we discussed the ***ongoing shift*** of more of our [EBA] enterprise customers to an annual billing cycle."

90. Clifford also made a new announcement that the Company planned to transition its indirect product subscription multiyear contracts to an upfront billing model: "Today, we'll discuss our intent to make the same shift for product subscription multiyear contracts starting in fiscal '24," referring to FY24, beginning February 1, 2023. She acknowledged that "this shift will result in a predictable initial decline in fiscal '24 as we transition" and "drive some short-term volatility" but reassured investors that "these kind[s] of transition[s] are worth it in the long run" and would "make Autodesk a more valuable company."

91. The timing for transitioning product subscriptions differed from the Company's stated timeline for moving all EBA customers to an annual model – the EBA transition would be complete by the start of FY23 (February 1, 2022), a full year prior to the start of the transition for product subscription customers.

92. In response to this announcement, a securities analyst asked whether the product subscription transition might start before FY24. Clifford explained that transitioning multiyear product subscriptions to the annual billing model would take longer than it did for EBA customers because it involved channel partner resellers: "So for our base ***product subscription*** multiyear contracts, we have 2 other factors on the table that we have to consider." The first was that the Company wanted to "ensure a smooth transition with our ***channel partners***," which was "***different than our EBAs*** because it's largely indirect," referring to the fact that sales through

channel partners are "indirect" in the sense that the Company does not deal directly with end customers, as it does with EBA customers. The second factor Clifford referenced was that the Company needed to build "back office" systems to "better manage a high volume of multiyear contracts with annual billings at scale," which would not be ready until "the back half of . . . fiscal '23."

93. In an accompanying slide presentation, the Company illustrated how moving from upfront to the annual billing model would impact its product subscriptions (emphasis added in red):




94. Notably, the Company's presentation slide did not refer to its EBA (direct) sales channel. Less than two weeks later, however, the Company reiterated to investors that all EBA customers would be billed annually as of February 1, 2022.

95. On September 14, 2021, at an investor conference, the Company reassured investors that the days of any upfront EBA deals were over. There, Clifford reiterated:

> So a lot of ***our EBAs were already on*** annual billing terms. And at the beginning of our fiscal '23 [starting February 1, 2022], we had already assumed that ***all of them*** would be on annual billing terms. We ***just decided to expedite that because,***

> ***again, it's a change that we think is better for our customers and better for Autodesk and will help us make Autodesk a more valuable company over time***.

96. Clifford ***again*** reassured investors that the Company was going to stop making upfront EBA deals. She also noted: "I'd point out just on the guidance piece is that even though we did reduce our billings guidance, the adjustment was only about 1 percentage point of our total billings guidance. So, it ***wasn't huge***."

97. The Company repeatedly told investors it wanted to get rid of all the product upfront deals as quickly as possible. Toward the end of FY22, for example, Anagnost told investors it was "full steam ahead" in ending upfront billing but that the Company could not "rip off the Band-Aid" as to product customers because its partners (who sold to product customers) needed time to make the change.

98. For example, on November 23, 2021, the Company held its earnings call for the third quarter of FY22, during which Anagnost engaged in the following question and answer with a securities analyst:

> [Analyst:] . . . And maybe just as a quick follow-up. Obviously, at ***Analyst Day*** [on September 1, 2021], we talked about some changes around billing terms, and you referenced it a little bit earlier in the call. Just curious how kind of early receptivity has been with customers as you kind of explain to them to changes that are coming?
>
> [Anagnost:] Yes. So look, our moves with regards to changing billing terms and smoothing out our free cash flow trajectory over multiple years are unchanged by any of this. ***We believe those are right for the business. We believe it's right for our customers. Customers are generally positive around these things because they prefer annual billings for – in most cases, they don't want to have to pay upfront if they don't have to***. Also, a lot of these things we've been talking about with regards to supply chain pressures, are viewed as pretty transient by us. These are not going to be persistent types of things. So customers view these fairly well. Our partners are getting themselves around some of these activities right now. But ***those plans are completely unchanged*** relative to anything we're seeing right now, and it's ***all full steam ahead*** on that transition.

99. Similarly, at an investor conference on November 30, 2021, a moderator asked Anagnost to address his "favorite topic, billing cycles." Anagnost responded:

> Yes. So frankly, if I could do it ***right now*** at this moment, I would just – I would ***flush out all of the upfront multiyear from our business right this very minute***, okay, and take ***whatever free cash flow hit we take next year*** because it – ***that upfront billing is the biggest piece of volatility in our free cash flow***, all right? And it's one of the reasons why people discount the free cash flow [as they go out in the year]. ***I want to eliminate that, clean up the business. And it's what our customers want too. Everybody wants to – wants the protection of a multiyear contract, but they want to pay for it annually, all right? Now why don't we just pull off, rip off the Band-Aid and do it, okay? There's 2 reasons why we don't rip off the Band-Aid. One is our partners, okay? Our partners are cash flow sensitive***. ***They love multiyear billings upfront***. A matter of fact, they – some of them will even add to our discount from – with – from their margins to kind of pull the deal in, all right? So we need to give our partners a 2-year runway, which is basically what we're giving them. We told them last year and we're ending – basically ending the discounts next year. So we're giving them a runway to transition. So we're going to work with them to make sure that they're paying attention and they have time to adjust their cash flow. Otherwise, we'd seriously damage some of our partners' business. ***The other thing, to be perfectly frank, is that our back-office systems are not set up to do multiyear billed annually at scale***. They will be next year. It's one of those long-tail things in the digitization transformation that I was doing for the back ends – back office of the company. That will get ***completed next summer***, so we'll be able to do it, but if I could, ***I'd pull that lever right now***.

100. Accordingly, Anagnost made clear to investors that Autodesk wanted to end its upfront billing model immediately to end the volatility it caused in Autodesk's cash flow but needed to give its channel partners more time to transition because of the impact of the change on the partners' cash flows and also because the Company needed to make back-office preparations to handle multiyear annual billings at scale, which Anagnost said he expected to complete in summer 2022.

101. The Company provided updates to the market on its progress in moving its channel partners to its annual billing model over the course of the next year. For example, on the Company's February 24, 2022 earnings call for the fourth quarter of FY22 ("4Q22") and FY22,

Clifford noted the Company was moving "***as quickly as possible***," but "we have customer, partner and operational constraints that we're working through as we navigate the transition." Clifford also reiterated: "we are upgrading ***our systems***," and "***our partners*** are . . . very important to our growth, very important to – in our ability to drive breadth and depth across the globe and engaging with customers," and they needed time to adjust to the elimination of the upfront billing model.

102. On the Company's first quarter of FY23 ("1Q23") earnings call held on May 26, 2022, Anagnost again reiterated: "***[n]one of us want***" upfront billing over annualized billing, but "***our partners can't get there fast enough***." In addition, on the Company's second quarter of FY23 ("2Q23") earnings call held on August 24, 2022, Clifford updated investors, again explaining the Company was still working on "***a partner transition plan [and] back-office system upgrades" but were going "as quickly as possible***."

103. Thereafter, on the Company's third quarter of FY23 ("3Q23") earnings call held on November 22, 2022, analysts questioned the Company's progress in making back-office changes and transitioning Autodesk's partners away from the upfront billing model. One analyst had questions about the financial impacts for FY24. Clifford explained: "We continue to be focused on executing on that transition ***as fast as possible*** because while the change is good for us, and it's good for our customers, from a financial standpoint, ***we really want the noise behind us***."

104. As she had on September 1, 2021, Clifford also noted that as soon the Company eliminated its upfront billing model with its partners, the Company's free cash flow would fall. As detailed above, this is because, under the new annual billing model for product subscriptions, the Company would collect less cash immediately upon the signing of the multiyear contracts

than it previously had collected under the upfront billing model but would collect more cash over time because of the annual ratable payments.

## VIII. DEFENDANT'S MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

105. At the start of the Relevant Period, on February 23, 2023, the Company filed a current report on Form 8-K with the SEC, which attached and incorporated by reference a press release reporting results from 4Q23 and FY23, which ended January 31, 2023. The press release quotes Anagnost and Clifford, showing they were ultimately responsible for the contents of the press release and Form 8-K used to file the press release. Anagnost and Clifford touted the Company's 4Q23 results and ***how*** the Company reached those results. Clifford stated: "Overall, ***the demand*** environment in Q4 remained consistent with Q3 ***with the approaching transition from up-front to annual billings for multi-year contracts, and a large renewal cohort, providing a tailwind*** to billings ***and free cash flow***."[8] Those specific factors supposedly explained how the Company achieved its free cash flow results, also reported in the same press release: (1) for 4Q23, "[f]ree cash flow was ***$903 million***, an increase of $187 million compared to the fourth quarter last year"; and (2) for FY23, "[f]ree cash flow increased to ***$2.03 billion***, compared to $1.48 billion in fiscal 2022."

106. The February 23, 2023 press release also reported the $2.03 billion figure in tabular format, as the following excerpt and related statements from the filing show:

[8] Because the press release quotes both Clifford and Anagnost, the statements in the press release and Form 8-k are attributable to each of them and also show that each authorized the distribution of all of the statements at issue.

**Autodesk, Inc.**
**Condensed Consolidated Statements of Cash Flows**
*(In millions) (1)*

| | Fiscal Year Ended January 31, 2023 | 2022 |
|---|---|---|
| | (Unaudited) | |
| Operating activities: | | |
| Net income | $ 823 | $ 497 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation, amortization and accretion | 150 | 148 |
| Stock-based compensation expense | 657 | 555 |
| Deferred income taxes | (277) | (8) |
| Lease-related asset impairments | 34 | 104 |
| Other operating activities | (8) | 18 |
| Changes in operating assets and liabilities, net of business combinations: | | |
| Accounts receivable | (247) | (66) |
| Prepaid expenses and other assets | (3) | (134) |
| Accounts payable and other liabilities | (5) | 10 |
| Deferred revenue | 798 | 419 |
| Accrued income taxes | 149 | (12) |
| Net cash provided by operating activities | 2,071 | 1,531 |
| Investing activities: | | |
| Purchases of marketable securities | (397) | (311) |
| Sales of marketable securities | 152 | 12 |
| Maturities of marketable securities | 298 | 26 |
| Purchases of intangible assets (2) | (6) | (11) |
| Business combinations, net of cash acquired | (96) | (1,250) |
| Capital expenditures | (40) | (56) |

107. The Company included a note accompanying the above table that defined "Free Cash Flow" in this way: "Cash flow from operating activities minus capital expenditures." Thus, "Free Cash Flow" was $2.071 billion minus $40 million, or $2.03 billion. As noted above, the press release purported to cite the factors that drove the $2.03 billion free cash flow result.

108. The Company's representations about ***how*** the Company achieved the $2.03 billion free cash flow results for FY23 gave the misleading impression that the Company's results had, ***in the manner presented, beat*** the lower end of the $2.0 billion-$2.08 billion free cash flow target or "guidance" the Company had previously reported to the market."[9] Meeting this free cash flow target was important to investors; for example, securities analysts from Berenberg Capital had written in a September 2, 2021 report that the free cash flow "FY23 target is an important metric for investors. Based on our discussions with investors, we know that many investors have based their valuation work around Autodesk's ability to reach that target." Importantly, that report came after Clifford told the market the Company had decided to

[9] On May 26, 2022, for example, Defendant Clifford told investors: "We expect free cash flow to be between $2.0 billion and $2.08 billion" for the 2023 fiscal year.

eliminate its upfront EBA billing model because customers did not like it and because the discounts associated with that model hurt the Company's profitability, as detailed above.

109. In this context, the Company's statements about the particular factors driving its $2.03 billion FY23 free cash flow results were materially false or misleading and omitted material facts. As the Company later admitted, despite telling investors that EBA upfront deals had been retired by the start of FY23, "[t]he Company ***subsequently determined***, however, ***to pursue multiyear*** upfront contracts with [EBA] customers to help meet its fiscal year 2023 free cash flow goal. Upfront billings of enterprise customers in fiscal year 2023 ***substantially exceeded historical levels, helping the Company to meet its lowered annual free cash flow target***." In other words, despite telling investors they had decided to end EBA upfront billings because they required discounts that hurt the Company's profitability, the Company intentionally pursued more of these EBA deals than it ***ever*** had before, just to meet its FY23 free cash flow target.

110. Accordingly, the Company did not achieve the $2.03 billion free cash flow figure because of the demands of customers for upfront deals that generated the related free cash flow, because of the "approaching" transition of product deals to the annual billing model, or because of a large "renewal" cohort. Rather, it was the Company – not the customers – that pursued supposedly retired upfront EBA deals in order to meet free cash flow targets. While there may have been some tailwind from the "approaching" product deal transition, it was misleading for Defendants to conceal the secret reversion to the supposedly retired EBA upfront billing model that drove FY23 results. Moreover, it was materially misleading to tout a large "renewal" cohort of EBA deals in FY23 while concealing that the Company had closed those deals by reversing course on its prior commitment to stop making EBA deals with upfront billing.

111. The Company's reported $2.03 billion free cash flow metric and the factors supposedly driving that result were materially false or misleading for additional reasons. The Company's Audit Committee admitted that, during FY23, "decisions regarding discretionary spending, collections, and accounts payable were informed by their anticipated effects on the Company's external free cash flow." These actions rendered the Company's free cash flow statements unreliable because accounts payable (and other expenses) are inputs to the Company's free cash flow calculations.

112. The Company gave written assurances to investors about the $2.03 billion free cash flow figure that were also materially false or misleading. Specifically, the February 23, 2023 Form 8-K stated that its incorporated press release included non-GAAP metrics (which included the free cash flow figure of $2.03 billion) to allow "for greater transparency" than just GAAP figures.

113. The Form 8-K further stated:

> [The reported non-GAAP metrics] are useful to investors both because (1) they allow for ***greater transparency*** with respect to ***key metrics used by management in its financial and operational decision-making*** and (2) they ***are used by Autodesk's institutional investors and the analyst community*** to help them analyze the health of the Company's business. This allows investors and others to better understand and evaluate Autodesk's ***operating results and future prospects in the same manner as management, compare financial results across accounting periods*** and to those of peer companies, and ***to better understand the long-term performance of its core business***.

114. These written assurances demonstrate Defendants' awareness that the Company's reported free cash flow was "***used*** by Autodesk's institutional investors and the analyst community to help them analyze the health of the Company's business."

115. Unbeknownst to investors, however, the accompanying $2.03 billion free cash flow figure (including some of its expense inputs, as well as explanation about the factors driving

the $2.03 billion result) did not "allow for greater transparency" or "better understand[ing of] the long-term performance of its core business." It obscured the Company's true financial condition, and how the Company achieved its financial condition, as noted above. Neither were the free cash flow numbers the same as those "used by management," nor did they enable investors to use free cash flow metrics "in the same manner as management." Management manipulated underlying operations, accelerating and increasing EBA upfront deals to make its FY23 free cash flow targets. In other words, as the proverbial tail wagging the dog, the Company used its ***forecast*** FY23 free cash flow guidance as ***the*** basis to reverse course on its billing model.

116. Nor did the FY23 free cash flow $2.03 billion figure allow investors to "compare financial results across accounting periods." Because the free cash flow results of FY23 included EBA upfront deals at levels that the Company admitted ***substantially exceeded*** historical amounts, FY23 was not comparable to FY22 and would also not be comparable to future years. Moreover, by including the secret EBA upfront deals and by gaming collections and expense inputs (such as accounts payable) that feed into the free cash flow number, Defendants made it impossible for investors to compare FY23 and FY24 results in a manner that allowed for "greater transparency." Thus, in secretly reversing course on its underlying EBA business model to "make the numbers," the Company made it practically impossible for investors to compare financial periods in a transparent way.

117. In the Company's February 23, 2023 press release, the Company also gave the market guidance for FY24 free cash flow projections. As noted, FY24 refers to the February 1, 2023 through January 31, 2024 time period. Accordingly, at the time the Company published its free cash flow guidance on February 23, 2023, three weeks of FY24 had already transpired.

118. As to the specifics of FY24 free cash flow guidance, the February 23, 2023 press release stated that "FY24 Guidance Metrics" included "$1,150-$1,250" million (or $1.15-1.25 billion) in free cash flow for the upcoming year.

119. On the Company's 4Q23 and FY23 earnings call, held on February 23, 2023, Clifford stated: "[w]e expect free cash flow to be between $1.15 billion and $1.25 billion," such that the "midpoint of that range, $1.2 billion, implies ***a 41% reduction in free cash flow compared to fiscal '23***" and that "the ***key drivers*** of that reduction are changes in long-term deferred revenue ***as a result of the shift to annual billings for multiyear customers***, and a smaller multiyear renewal cohort, FX and our cash tax rate." In other words, this FY24 $1.2 billion "midpoint" in free cash flow guidance represented a ***decline of $830 million*** in free cash flow relative to FY23 – *i.e.*, a decline from $2.03 billion in FY23 to $1.2 billion in FY24, or 41% year over year.

120. This was false or misleading for two reasons. First, it was false or misleading to state that the 41% decline in free cash flow was attributable to one of the key drivers – "the shift to annual billings for multiyear customers" (which the Company conditioned the market to believe was about the Company's reseller "product" customers) – without disclosing that a material portion of the drop was attributable to ***EBA*** upfront deals made in FY23 to meet free cash flow targets.[10] While FY24 may well have included a "smaller multiyear renewal cohort" of deals and other factors, the excessive and less profitable EBA upfront deals in FY23 materially

[10] Upfront EBA deals in FY23 materially lowered free cash flow in FY24 and FY25 because: (1) as the Company had previously explained, upfront deals necessarily result in lowered free cash flow in "out" years, *i.e.*, the second and third years of a three-year deal; (2) as the Company later admitted, "[u]pfront billings of [EBA] customers in fiscal year 2023 substantially exceeded historical levels"; and (3) the substantial upfront deals closed in FY23 would be in "out" years in FY24 and FY25, the period during which the Company drastically lowered its free cash flow guidance.

contributed to the drop. Because the Company effectively pulled free cash flow from FY24 into FY23 from EBA upfront deals, at levels that "substantially exceeded" historical amounts, the FY24 drop in free cash flow necessarily included a material amount of free cash flow that ***would*** have been recorded in FY24 if the Company had ***not*** recorded so much free cash flow from EBA upfront deals in FY23. In other words, the $830 million drop from: (1) FY23 free cash flow (of $2.03 billion) to (2) the FY24 midpoint guidance of $1.2 billion would have been materially smaller in the absence of the supposedly retired EBA upfront deals in FY23, which the Company told the market it was discontinuing in FY22.

121. In addition, the Company's FY24 guidance was misleading because the $1.2 billion projection included EBA upfront deals, which, again, the Company had previously told investors had been retired. Indeed: (1) as the Company later disclosed in FY24, the FY24 free cash flow projection included $200 million in upfront deals from 1Q24;[11] (2) next, after the end of FY24, the Company reiterated that it had made $200 million in upfront deals in FY24;[12] (3) after the Company's Audit Committee completed its investigation, the Company admitted it had continued to make EBA upfront deals in FY24;[13] and, finally, (4) *Bloomberg* reported that "previously unreported internal documents" showed "[e]mployees warned executives about the strategic risk in early 2022, but the company continued to book such deals at least until the fiscal

---

[11] For example, on a November 21, 2023 conference call, Clifford stated: "And second, the transition to annual means that about ***$200 million*** of free cash flow in Q1 fiscal '24 that came from multiyear contracts built [sic] upfront will not recur in fiscal '25.

[12] For example, on a February 24, 2024 conference call, Clifford stated : "***Excluding $200 million from fiscal '24 free cash flow from multiyear upfront billings, which are now billed annually***, in fiscal '25 , we expect free cash flow growth of about 35% at the midpoint of our guidance. We expect faster free cash flow growth in fiscal '26 because of the return of our largest multiyear renewal cohort, the mechanical stacking of multiyear contracts billed annually and a larger EBA cohort."

[13] On May 31, 2024, the Company issued a press release that included this information: "The Company separately notes that multiyear ***upfront billings of enterprise customers in fiscal year 2024*** was substantially lower than fiscal years 2022 and 2023."

year ending in January 2024."[14] In combination, these facts permit an inference that the $200 million in upfront deals in 1Q24 included EBA deals the Company had supposedly retired well before FY24. This further demonstrates that Defendants' statements about the factors driving FY24 free cash flow guidance were materially false and misleading at the time, as detailed above.

122. On March 14, 2023, the Company filed its annual report on Form 10-K with the SEC for FY23. Among other things, the report defined "Free Cash Flow" as: "[c]ash flow from operating activities minus capital expenditures." The Company reported free cash flow in a tabular format that compared FY23 (ending January 31, 2023) with FY22 (ending January 31, 2022) and FY21 (ending January 31, 2021). The following excerpt shows these results:

**AUTODESK, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In millions)**

| | Fiscal year ended January 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Operating activities: | | | |
| Net income | $ 823 | $ 497 | $ 1,208 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation, amortization, and accretion | 150 | 148 | 124 |
| Stock-based compensation expense | 657 | 555 | 398 |
| Deferred income taxes | (277) | (8) | (779) |
| Lease-related asset impairments | 34 | 104 | — |
| Other operating activities | (8) | 18 | 39 |
| Changes in operating assets and liabilities, net of business combinations: | | | |
| Accounts receivable | (247) | (66) | 13 |
| Prepaid expenses and other assets | (3) | (134) | (56) |
| Accounts payable and other liabilities | (5) | 10 | 130 |
| Deferred revenue | 798 | 419 | 344 |
| Accrued income taxes | 149 | (12) | 16 |
| Net cash provided by operating activities | 2,071 | 1,531 | 1,437 |
| Investing activities: | | | |
| Purchases of marketable securities | (397) | (311) | (21) |
| Sales of marketable securities | 152 | 12 | — |
| Maturities of marketable securities | 298 | 26 | 17 |
| Purchases of intangible assets | (6) | (11) | (5) |
| Business combinations, net of cash acquired | (96) | (1,250) | (246) |
| Capital expenditures | (40) | (56) | (91) |

123. These figures correspond to the free cash flow numbers the Company reported in the February 23, 2023 press release. For example, in accordance with the definition of "Free Cash Flow," $2.07 billion in operating cash minus $40 million in capital expenditures results in the $2.03 billion annual free cash flow.

[14] Brody Ford, *Autodesk Executives Ignored Accounting Risks, Documents Show*, BLOOMBERG (Aug. 16, 2024).

124. Moreover, the annual report stated:

> ***Payments for product subscriptions,*** industry collections, cloud subscriptions, and maintenance subscriptions are ***typically due up front*** with payment terms of 30 to 45 days. ***Payments on EBAs are typically due in annual installments*** over the contract term, with payment terms of 30 to 60 days.

125. The March 14, 2023 annual report attached certifications by Anagnost and Clifford. The certifications included substantive assurances about the report: that it "does not contain ***any untrue statement of a material fact or omit to state a material fact*** necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and that the "the financial statements, and other financial information included in this report, ***fairly present in all material respects*** the financial condition, ***results of operations and cash flows*** of the registrant as of, and for, the periods presented in this report."

126. The certifications also addressed how the Company derived the reported information: specifically, that Anagnost and Clifford "are responsible for establishing and maintaining disclosure controls and procedures," including "internal control[s] over financial reporting." They further certified that ***each had disclosed to "the audit committee*** of the registrant's board of directors (or persons performing the equivalent functions)" all "significant deficiencies and ***material weaknesses*** in the design ***or operation*** of internal control over financial reporting which ***are reasonably likely*** to adversely affect the registrant's ability to record, process, ***summarize and report*** financial information."

127. As Clifford and Anagnost knew or should have known at the time, their statements about how, why, and how much free cash flow the Company generated and reported in FY23 were materially false and misleading at the time for substantially the same reasons

Clifford and Anagnost's corresponding statements of February 23, 2023, discussed above, were materially false and misleading.

128. In addition, the statement that the Company "***typically***" only did annual payment deals with EBA customers was materially false or misleading because, as the Company later admitted, the Company's EBA upfront billings "***substantially exceeded historical levels***" in FY23. As a result, the Company's FY23 $2.03 billion figure was materially false and misleading because the Company did not achieve that result following its "typical[]" EBA annual payment business model.

129. Finally, Anagnost's and Clifford's certifications that they had reported to the Company's Audit Committee all material weaknesses in the operation of internal financial controls that were "reasonably likely" to adversely affect the Company's ability to "summarize and report" financial information was materially false or misleading, as they knew or should have known at the time. The Company's Audit Committee did not know about the secret change in the Company's EBA billing model that resulted in free cash flow in FY23 from EBA upfront deals that "substantially exceeded historical levels." Nor did the Audit Committee know about the manipulation of collections, spending, and accounts payable that further undermined the reliability of the Company's FY23 free cash flow numbers at the time Anagnost and Clifford made the above certifications on March 14, 2023. Instead, the Audit Committee stated it had learned these facts in 2024, which led to the Audit Committee's investigation into these subjects and its eventual admission that the Company had to make changes: "reviewing certain processes around financial communications and disclosures; assessing certain Company organizational functions and responsibilities; and adopting and enhancing policies, processes, and controls related to the matters investigated."

130. On March 22, 2023, the Company held an investor day call, during which it referred investors to its discussion on its previous FY22 investor day (September 1, 2021), regarding the tiered transition of the EBA (direct) and products (indirect) channels to its annual billing model and its elimination of the upfront billing model. Clifford explained: "Since then we've been working hard to prepare our back office to handle this change in an automated customer-friendly way and to work with ***our channel partners*** to ensure their readiness for the transition. I'm pleased to announce that ***we're going live next week***."

131. Clifford's slide presentation reiterated points made at the prior investor day (emphasis added in red):




132. On the same call, Clifford further stated:

> As we've highlighted before, the switch from upfront to annual billings for most multiyear customers creates a ***significant*** headwind for free cash flow in fiscal '24 and a ***smaller*** headwind in fiscal '25. Change in deferred revenue increased fiscal '23 free cash flow by $790 million, but ***will reduce fiscal '24 free cash flow by approximately $300 million***.

133. With respect to the impact of the billing model change on free cash flow, Clifford again referred investors to the Company's statements on the September 1, 2021 investor day call: "We set out the net effect of all this ***at our last Investor Day*** and the trajectory remains broadly

***the same***." Thus, Clifford reaffirmed her previous September 1, 2021 statements that Autodesk planned to transition away from upfront billing because the annual billing model was better for the Company.

134. These statements, which Clifford incorporated by reference into her March 22, 2023 investor day statements, were materially false and misleading. Far from following a "trajectory [that] remains broadly ***the same***" as the business model presented at the prior investor day presentation, the Company dramatically reversed course and intentionally pursued more of these EBA deals than it ever had before, just to barely meet its FY23 free cash flow target. As it would later admit, the Company secretly pursued EBA upfront deals in order to meet its free cash flow target for the year ending January 31, 2023 (FY23) in amounts that "substantially exceeded historical levels."

135. Clifford's March 22, 2023 statements with respect to transitioning product customers to annual billing "***will reduce fiscal '24 free cash flow by approximately $300 million***" were also materially false and misleading because they failed to disclose that the $300 million reduction also reflected the large boost in EBA upfront deals in FY23, which, unbeknownst to investors, materially contributed to lower free cash flow in FY24.

136. On May 9, 2023, Autodesk filed its 2023 Proxy Statement. The 2023 Proxy statement was solicited by Defendants Anagnost, Smith, Blasing, French, Howard, Irving, McDowell, Milligan, Norrington, Rafael, and Rahim. The 2023 Proxy Statement solicited shareholders to vote to approve, among others: (i) the re-election of certain directors to the Board; (ii) the ratification of the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending January 31, 2024; (iii) executive compensation; and (iv) frequency of executive compensation votes.

137. Concerning the Board's role in risk oversight, the 2023 Proxy Statement stated:

Our Board, as a whole and through its committees, is responsible for the oversight of risk management. Senior management is responsible for the day-to-day management of the material risks Autodesk faces. In its oversight role, our Board must satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as designed. The involvement of the full Board in setting our business strategy at least annually is a key part of its oversight of risk management, its consideration of management's appetite for risk, and its determination of what constitutes an appropriate level of risk. The full Board receives regular updates from our senior management and outside advisers regarding certain risks Autodesk faces, including litigation, cybersecurity, data privacy, corporate governance, and various operating risks.

In addition, while our Board is responsible for monitoring and assessing strategic risk exposure, our committees are charged with specific areas of risk oversight, as summarized below:

*Audit Committee.* Our Audit Committee is responsible for overseeing the management of risks associated with Autodesk's financial reporting, accounting, and auditing matters, as well as cybersecurity risks relating to financial, accounting, and internal controls matters.

*Compensation and Human Resources Committee*. Our Compensation and Human Resources Committee oversees our executive officer succession planning and risks associated with our compensation policies and programs.

*Corporate Governance and Nominating Committee*. Our Corporate Governance and Nominating Committee oversees the management of risks associated with director independence, conflicts of interest, composition and organization of our Board, and director succession planning. Board committees report their findings to the full Board.

Senior management attend all meetings of the Board and its standing committees and are available to address any questions or concerns raised by the Board regarding risk management and any other matters. The Board holds annual strategic planning sessions with senior management to discuss strategies, key challenges, and risks and opportunities for Autodesk.

138. Within the 2023 Proxy Statement, Defendants stated:

We achieved strong financial and competitive performance in fiscal 2023 despite macroeconomic, policy, geopolitical and pandemic related headwinds. Several factors contributed to our performance, including robust renewal rates, strong growth in subscriptions, ***rapidly expanding digital sales with the approaching transition from up-front to annual billings for multi-year contracts***, and a large

> renewal cohort which provided an additional tailwind to billings and free cash flow.

139. Defendants' statements set forth above were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact. In truth, contrary to these statements highlighting the financial performance in fiscal year 2023 and crediting that success to expanding digital sales in light of the transition from up-front to annual billing, the Company had actively pursued upfront EBA deals in FY23 contrary to the representations that Autodesk made to the investing public.

140. Furthermore, the 2023 Proxy Statement was also false and misleading as it failed to disclose that the Company did not in fact maintain proper internal controls as it pertained to risk management.

141. About two months after Clifford told investors to expect a decline in FY24 free cash flow due to moving product customers into the annual billing model, something surprising happened.

142. First, on May 25, 2023, the Company filed a current report with the SEC on Form 8-K attaching and incorporating by reference a press release announcing the Company's 1Q24 financial results. Clifford and Anagnost were both quoted in the press release,[15] which stated, in pertinent part: "free cash flow was $714 million" for the quarter. It also reiterated the FY24 free cash flow guidance of "$1,150-$1,250" million. The press release quoted Clifford: "'Autodesk started the year strongly ***with rising renewal rates, robust free cash flow generation***, and revenue toward the ***top end of our guidance*** range when adjusted for upfront revenue co-termed to later in the year,'" and with "'normal seasonality, peak second quarter currency and Russia

[15] Because the press release quotes Clifford and Anagnost, the statements in the press release and Form 8-K are attributable to each of them as with the February 23, 2023 press release and Form 8-K, discussed above.

headwinds, and ***a strong second-half pipeline of enterprise agreements*** last renewed three years ago in the immediate aftermath of the onset of the pandemic, we remain on track to achieve ***our full-year financial goals***.'" Here, Clifford purportedly flagged "renewal rates" as driving up free cash flow in 1Q24 and "enterprise agreements" in the second part of the year as factors driving FY24 guidance. These statements were materially false and misleading as detailed below.

143. Later that same day, the Company held its 1Q24 earnings call. After Anagnost had touted the Company's "***record*** first quarter free cash flow," Clifford stated: "Free cash flow was $714 million in the first quarter, up 69% year-over-year." Clifford reiterated the Company still "expect[ed] free cash flow to be between $1.15 billion and $1.25 billion," with the "midpoint of that range" being $1.2 billion. The Company somehow collected almost ***60%*** of the cash flow it expected to collect for the ***entire fiscal year*** in the first three months alone. This raised questions among market participants.

144. For example, an analyst from Barclays Bank noted that the first quarter free cash flow results were well ahead of expected results. The analyst asked Clifford what accounted for these results, in the context of FY24 being a low cash flow year, due to the supposed transition of product customers to the annual billing model. As the analyst put it:

> ***Great to see the cash flow strength this quarter, well ahead of what we were expecting***. I was just wondering if you could just zoom into ***what drove that***, and maybe just looking forward, how you're sort of thinking about the shape of cash flow this year, particularly where we trough here in fiscal '24. Does that make sense?

Clifford responded in relevant part:

> Yes, yes. So ***Q1 free cash flow*** was strong for a couple of reasons. First, ***cash collections from the last month of billings in fiscal '23 [i.e., January 1-31, 2023] were strong***. Second, we also saw favorable linearity and early renewals in Q1 that were driven by the end of multiyear billed upfront. And then third, as I mentioned on the call, after the winter storms in California, we received a federal tax payment extension for the third quarter.

145. These statements and the related statements in the press release and Form 8-K of the same day (detailed above) were materially false and misleading. Unbeknownst to investors, Defendants' stated factors driving 1Q24 reported "record free cash flow" of $714 million (*i.e.*, "renewal rates") and FY24 free cash flow projections of $1.2 billion (*i.e.*, EBA deals in the second half of the year) were materially misleading. The 1Q24 free cash flow results and FY24 free cash flow guidance included a one-time bump of $200 million in upfront deals that would not recur in FY25; this, in turn, concealed the full impact the FY23 EBA upfront deals had on FY24 free cash flow. In addition, the 1Q24 free cash flow results and FY24 free cash flow guidance included EBA upfront free cash flow. Including upfront free cash flow from EBA customers in 1Q24 results and guidance (while pointing to other factors driving those metrics) was materially false or misleading because the corresponding EBA upfront billing model (which generated some of the $714 million free cash flow in 1Q24 that fed into the FY24 guidance) had supposedly been retired a full year prior.

146. On June 1, 2023, the Company filed its 1Q24 quarterly report with the SEC. Among other things, the 1Q24 quarterly report reiterated the quarter's free cash flow of $714 million, which was materially false and misleading by omission for substantially the same reasons as the May 25, 2023 press release and earnings call, as stated above. Anagnost and Clifford also executed certifications with respect to this report substantially similar to those they made with respect to the FY23 annual report. These certifications were materially false and misleading for the same reasons as the certifications in the FY23 annual report: namely, that they had not fairly presented the Company's free cash flow and had not reported to the Company's Audit Committee all material weaknesses in the operation of internal financial controls that were "reasonably likely" to adversely affect the Company's ability to "summarize and report."

147. On August 23, 2023, the Company filed a current report with the SEC on Form 8-K that attached and incorporated by reference a press release announcing the Company's 2Q24 financial results, including that "free cash flow was $128 million" for the quarter. The press release quoted Clifford in pertinent part:[16]

> "Our sustained momentum in the second quarter, and ***early expansion of some enterprise business agreements expected to renew later in the year***, reduce the likelihood of our more cautious forecast scenarios," said Debbie Clifford, CFO of Autodesk. "Given that, ***we are raising the lower end of our guidance ranges***."

148. Consistent with Clifford's comments, the press release ***raised*** the lower end of the FY24 free cash flow guidance metric to "$1,170-$1,250 [million]." Unbeknownst to investors, however, this increased FY24 free cash flow guidance included free cash flow from EBA upfront deals that Clifford had also included in the Company's original FY24 guidance, discussed above. This revised guidance was substantially false or misleading for substantially the same reasons and because Clifford referenced EBA deals in the second part of the year without disclosing the upfront EBA cash flow the Company collected in the first quarter of the year.

149. On August 29, 2023, the Company filed with the SEC its quarterly report for 2Q24, reporting $842 million in free cash flow for the first six months of FY24, which included free cash flow from EBA upfront deals, as discussed above. Accordingly, the $842 million figure was materially false or misleading by omission for substantially the same reasons the corresponding figure in 1Q24 was materially false or misleading. Anagnost and Clifford gave certifications about the 2Q24 report substantially similar to the certifications they made with respect to the FY23 annual report and the 1Q24 report. These certifications were materially false and misleading for the same reasons as the certifications in those reports: namely, that they had

[16] Because the press release quotes Clifford and Anagnost, the statements in the press release and Form 8-K are attributable to each of them as with the February 23, 2023 press release and Form 8-K, discussed above.

not fairly presented the Company's free cash flow and had not reported to the Company's Audit Committee all material weaknesses in the operation of internal financial controls that were "reasonably likely" to adversely affect the Company's ability to "summarize and report."

## IX. THE TRUTH EMERGES

150. On the evening of November 21, 2023, the truth about Defendants' fraud began to emerge. On that day, the Company filed a current report with the SEC on Form 8-K attaching and incorporating by reference a press release announcing results for the third quarter of FY24 ("3Q24"). The press release quoted both Anagnost and Clifford.[17] The press release's quote of Clifford discussing 3Q24 results stated, among other things: "Overall market conditions and the underlying momentum of the business remained similar to the last few quarters. Our ***financial performance*** in the third quarter was strong with much of the outperformance ***coming from larger-than-expected expansions of existing EBAs***." The press release further reported: "free cash flow was $13 million" for the quarter. This was the ***lowest quarterly free cash flow the Company had reported in more than five years***.

151. The Company held an earnings conference call with investors the same evening. During the call, Clifford revealed that the Company's situation was even worse and would negatively impact free cash flow in the upcoming years: the "transition to annual billings means that about ***$200 million*** of free cash flow in ***Q1 fiscal '24*** that came from multiyear contracts build [sic] ***upfront*** will ***not*** recur in fiscal '25," she said. Later in the call, Clifford responded to analysts' questions about how to model free cash flow into the following year, stating: "So ***take***

[17] Because the press release quotes Clifford and Anagnost, the statements in the press release and Form 8-K are attributable to each of them as with the February 23, 2023 press release and Form 8-K, discussed above.

***out the $200 million*** and then it should have a ***more reasonable*** – that will give you ***more reasonable*** modeling expectations as you think about modeling fiscal '25 and beyond."

152. The $200 million in upfront free cash flow referenced by Clifford is ***the same*** $200 million in free cash flow Defendants ***included*** in their statements regarding 1Q24 and 2Q24 free cash flow (discussed above). Specifically, with respect to the drop from FY23 to FY24 in free cash flow (from FY23 free cash flow of $2.03 billion to the FY24 "midpoint" free cash flow guidance of $1.2 billion), Defendants included some EBA upfront free cash flow in the $200 million of upfront deals they used to arrive at the $1.2 billion "midpoint" of free cash flow guidance, despite pointing to other factors driving the $1.2 billion guidance. In so doing, at the FY24 investor day event, Defendants made the FY23 to FY24 free cash flow drop ***appear*** less drastic than it was in fact in light of the factors supposedly driving the drop; and in so doing, the Company further concealed the full impact the FY23 EBA upfront deals had on FY24 free cash flow. As particularized above, the $200 million in free cash flow the Company told investors to "take out" on November 23, 2023 also included some FY24 free cash flow attributable to EBA upfront deals, which, of course, investors did not know was a part of the FY24 free cash flow guidance because the Company had supposedly eliminated all of those deals by the beginning of FY23.

153. Analysts responded negatively to this news in reports issued on November 22, 2023. For example, Barclays analysts wrote: "~$200M of multi-year billings in FY24 . . . needs to come out of our FY25 base," and "[w]e also take this out of FY26." Similarly, J.P. Morgan analysts noted: "On cash, management reminded investors that about $200 million of free cash flow in 1Q24 that came from multi-year contracts billed upfront tied to the transition to annual billings will not recur in fiscal '25, ***making the '24 base closer to $1 B***, though '24 is still

expected to be the trough." Piper Sandler & Co. analysts wrote that while they had hoped FY24 would be a "trough year" with regard to free cash flow and other metrics, they were now "substantially less optimistic" about the stock's value due to the "$200M of [***free cash flow***] benefit from multiyear billings that ***still*** hit in FY24." Oppenheimer & Co. Inc. likewise reported it had "encountered mostly pushback [from investors] in our conversations and inbox."

154. On November 22, 2023, the day after the Company's earnings announcement and conference call, the Company's ***stock price fell by almost 7%***, from a close of $217.67 per share on November 21, 2023 to a close of $202.66 per share on November 22, 2023.

155. On December 4, 2023, the Company filed with the SEC its quarterly report for 3Q24 on Form 10-Q, reporting $855 million in free cash flow for the first nine months of FY24, which included free cash flow from EBA upfront deals, as discussed above. Accordingly, the $855 million figure was materially false or misleading by omission for substantially the same reasons the corresponding figure in 1Q24 and 2Q24 was materially false or misleading. In addition, Anagnost and Clifford executed certifications with respect to the 3Q24 report substantially similar to the certifications they made with respect to the FY23 annual report, the 1Q24 report, and the 2Q24 report. These certifications were materially false and misleading for the same reasons as the certifications in those reports; namely, that they had not fairly presented the Company's free cash flow and had not reported to the Company's Audit Committee all material weaknesses in the operation of internal financial controls that were "reasonably likely" to adversely affect the Company's ability to "summarize and report."

156. On February 29, 2024, the Company filed a current report with the SEC on Form 8-K attaching and incorporating by reference a press release with quotes from Anagnost and

Clifford announcing results from 4Q24 and FY24.[18] The press release repeated prior statements about the Company's free cash flow performance in FY23 and FY24: "Free cash flow decreased to $1.28 billion, ***compared to $2.03 billion in fiscal 2023***." This $2.03 billion figure and the comparison to prior years were materially false and misleading for substantially the same reasons the prior comparable statements were materially false and misleading throughout FY24.

157. Also, on the February 29, 2024, the Company held an earnings call with analysts regarding 4Q24 and FY24 results. On that call, Clifford said the Company's "financial performance in the fourth quarter and ***for the fiscal year was strong, particularly in our Enterprise business***." As to free cash flow reported in FY24, again Clifford noted investors should be "[e]xcluding $200 million from fiscal '24 free cash flow from multiyear upfront billings, which are now billed annually."

158. Defendants' February 29, 2024 statements in the Form 8-K and incorporated press release and earnings call were materially false and misleading because they cited EBA deals as contributing to "strong" financial performance and failed to disclose how EBA upfront deals contributed to the relative weakness in FY24 financial performance, including that: (1) the Company's FY23 free cash flow had been artificially inflated by upfront EBAs that had "substantially exceeded" historical levels; (2) this artificial inflation in FY23 resulted in materially lowered free cash flow in FY24; (3) the $200 million in FY24 free cash flow attributable to upfront deals included EBAs billed upfront, despite the Company's prior representations that it would no longer use an upfront billing model for EBAs; and (4) as later admitted by the Company, Defendants made "certain decisions regarding discretionary spending,

[18] Because the press release quotes Clifford and Anagnost, the statements in the press release and Form 8-K are attributable to each of them as with the February 23, 2023 press release and Form 8-K, discussed above.

collections, and accounts payable . . . informed by their anticipated effects on the company's external free cash flow and/or non-GAAP operating margin targets," which "generally served to reduce reported free cash flow and/or lower reported margin in the current period" and further undermined the reliability of the Company's corresponding operating margin and free cash flow metrics.

159. After the market closed on April 1, 2024, the Company filed Form 12b-25 with the SEC – a notice of late filing of the Company's FY24 annual report. Rule 12b-25 permits companies, in certain circumstances, to file their annual reports up to 15 days late.

160. The Company attributed its inability to timely file the report to a previously undisclosed investigation into the Company's free cash flow and non-GAAP operating practices:

> Autodesk, Inc. (the "Company") is unable to file its Annual Report on Form 10-K for the year ended January 31, 2024 (the "Form 10-K") within the prescribed time period, without unreasonable effort or expense. ***After*** the Company's earnings release on February 29, 2024, information was brought to the attention of management, which promptly informed the Audit Committee (the "Committee") of the Board of Directors of the Company, that caused the Committee to commence an internal investigation with the assistance of outside counsel and advisors, ***regarding the Company's free cash flow and non-GAAP operating margin practices***. The Committee is comprised entirely of outside "independent directors" as defined by the Nasdaq Stock Market listing standards. The ***investigation is ongoing*** and all parties are working diligently to complete the investigation. The Company has voluntarily contacted the Securities and Exchange Commission (the "Commission") to advise it that an internal investigation is ongoing, and the Committee intends to provide additional information to the Commission as the investigation proceeds. The Company needs further time to assist the Committee in its investigation and to review its practices in this regard.

161. This caused the Company's stock price to decline over ***4%***, from a close of $259.44 on April 1, 2024 to a close of $248.71 on April 2, 2024. Analysts from Barclays commented that while the delayed filing on account of an investigation was a headline that "is

never good to see," they were optimistic to "hear this is expected to be resolved within 15 days." The investigation took longer than 15 days.

162. On April 16, 2024, the Company filed with the SEC a current report on Form 8-K, stating the Company expected to receive a delinquency notice from Nasdaq regarding the Company's late Form 10-K:

> As previously disclosed, the filing of the Form 10-K was delayed due to the matters described in the Form 12b-25 and the Prior Press Release. As of today, the internal investigation described in the Form 12b-25 and the Prior Press Release is ongoing and all parties continue to work diligently to complete the investigation and to file the Form 10-K as soon as practicable. ***The subject of the internal investigation remains the same as previously disclosed***, and the Company currently does not believe that any of the matters under investigation affect any previously issued financial statements or the information in the Company's earnings release on February 29, 2024.

163. This caused the Company's stock price to fall almost ***6%*** from a closing price of $228.24 per share on April 16, 2024, to a close of $214.92 per share on April 17, 2024. As one market commentator noted at the time:

> Shares of design software company Autodesk (NASDAQ: ADSK) fell 7.8% in the morning session after the company provided an update on an ongoing internal investigation, which will delay filing its annual report for the year ended January 31, 2024 within the grace period provided by the SEC (Securities and Exchange Commission).[19]

The commentator further noted that, in "a report filed with the SEC on April 1, 2024, the Company revealed it was working with outside counsel and advisors regarding its free cash flow and non-GAAP operating margin practices." The article explained: ***"this update is likely to raise concerns about the business."***

164. On May 31, 2024, Defendants issued a press release finally detailing the principal findings of the Audit Committee's investigation, which they buttressed with rosy statements

[19] Max Juang, *Why Autodesk (ADSK) Stock Is Trading Lower Today*, YAHOO!FINANCE (Apr. 17, 2024), https://finance.yahoo.com/news/why-autodesk-adsk-stock-trading-151454911.html.

about the Company's prospects and growth for the upcoming year. In the press release, Anagnost made this mixed statement discussing, simultaneously, the Audit Committee's free cash flow investigation ***and*** the Company's optimistic projected numbers for the future: "We appreciate your patience as we work through this important process. We take situations like this very seriously and are grateful to ***put the investigation behind us***," said Andrew Anagnost, Autodesk president and CEO. "In the ***first quarter of fiscal 2025, we generated broad-based growth*** . . . in AEC and manufacturing across products and regions. . . . The new transaction model implementation is on track. . . . ***Our strong start sets us up well to achieve our goals for the year***."

165. The press release also touted the Company's projected ***double-digit billings growth of 12%-15% and projected revenue growth of 9%-11% for FY25***, which exceeded analysts' expectations. Curiously, contrary to every other press release announcing quarterly results for years, the press release said nothing about free cash flow in 1Q25.

166. The press release announced that "management" (which included at least Anagnost, as the CEO) had decided not to make any "restatement or adjustment" to the Company's previously reported non-GAAP numbers, which, of course, included free cash flow.

167. The Company also announced that Clifford would be immediately replaced by an interim CFO and had been shifted to a role that had nothing to do with financial reporting – a clear demotion.

> Elizabeth "Betsy" Rafael has been appointed by the Board as Interim Chief Financial Officer (Principal Financial Officer), effective May 31, 2024. As Interim Chief Financial Officer, she is not currently an "independent director" for purposes of the Nasdaq Stock Market and has stepped down from the Audit Committee. She remains a director of the company.
>
> Deborah L. Clifford has been appointed as the company's Chief Strategy Officer, reporting to the Chief Executive Officer, effective May 31, 2024. Her

responsibilities will include, among other things, corporate development, new vertical businesses that are outside Autodesk's existing product groups, and the company's Social Impact and Sustainability efforts.

168. The same press release included a "summary" of the Audit Committee's "principal findings" for the investigation of FY22-FY24, which included:

- The Company has historically relied on multiyear contracts with its enterprise and product subscription customers, billed upfront, to help meet its free cash flow targets. During the Relevant Period, the Company engaged in programs designed to incentivize customers to accept multiyear upfront billing, renew early, and/or pay before the end of the fiscal year.

- The Company has disclosed its practice of incentivizing customers to adopt multiyear upfront billing arrangements. It has also acknowledged that discounted multiyear upfront contracts reduce revenue and lower billings in out years. Though ***prior to fiscal year 2024,*** the Company did not quantify free cash flow attributable to multiyear upfront billings, it has noted the contribution of upfront collections to fluctuations in the Company's quarterly reported long-term deferred revenue.

- During fiscal year 2022, ***the Company announced that it had begun to shift enterprise customers to contracts billed annually, and that it had assumed fiscal 2023 enterprise contracts would be billed annually.*** The Company subsequently determined, however, ***to pursue multiyear upfront contracts with enterprise customers to help meet its fiscal year 2023 free cash flow goal.*** Upfront billings of enterprise customers in fiscal year 2023 ***substantially exceeded historical levels,*** helping the Company meet its lowered annual free cash flow target.

- In addition, ***during the relevant period,*** certain ***decisions regarding discretionary spending, collections, and accounts payable were informed by their anticipated effects on the Company's external free cash flow and/or non-GAAP operating margin targets.*** The resulting actions generally served to reduce reported free cash flow and/or lower reported margin in the current period. [FY24].[20]

169. The press release further stated: "[s]eparate from the Audit Committee's findings, the company notes that multiyear upfront billings of enterprise customers in fiscal year 2024 was substantially lower than fiscal years 2022 and 2023."

[20] The "current period" refers to FY24, as analyst reports noted in reviewing the Audit Committee's principal findings.

170. Moreover, the Company explained its Audit Committee "proposed certain remedial measures including reviewing certain processes around financial communications and disclosures; assessing certain Company organizational functions and responsibilities; and adopting and enhancing policies, processes, and controls related to the matters investigated."

171. However, the press release sought to neutralize the impact of the Audit Committee's findings. In addition to the announcement that "management has determined that there will be no restatement," it included the finding that "[t]hough free cash flow was one factor in the Company's executive compensation program, these decisions were not calculated to influence compensation outcomes." However, as detailed below, this finding is directly contradicted by the Company's own compensation policies, which were designed ***so that*** Anagnost's and Clifford's decisions were heavily influenced by their impact on the Company's reported free cash flow. The Audit Committee's assertion that free cash flow was "one factor" in Anagnost's and Clifford's compensation is literally true: free cash flow was "one" of "three" key elements, as discussed below.

172. On June 10, 2024, the Company filed its FY24 annual report on Form 10-K. On the first substantive page of the report, the Company provided an "EXPLANATORY NOTE" regarding the investigation explaining that, as "previously announced on April 1, 2024," the Company's Audit Committee launched an investigation into the Company's reported free cash flow. The Audit Committee had investigated FY22, FY23, and FY24, and the Audit Committee's "principal findings" included the same points set forth in the Company's May 31, 2024 press release, discussed above.

173. Moreover, the Form 10-K further revealed the Company had been contacted by the U.S. Attorney's Office for the Northern District of California in connection with the internal investigation.

174. On June 17, 2024, Starboard, an Autodesk investor that owned $500 million in Autodesk stock, published a letter discussing the Audit Committee's discovery that the Company "intentionally misled investors on its billings practices as it manipulated free cash flow":

> ***This was a clear case of a company saying one thing to investors and doing something completely different***. Autodesk had an obligation to not mislead investors with its public commentary, but instead of honoring this obligation, Autodesk did the opposite – the ***Company told investors it was at the tail-end of a process to move enterprise customers to annual billings***. The Company went to ***great lengths*** to discuss that it was better for the Company to move to annual billings to reduce discounts and to have more consistent cash flow, among other reasons. Instead, when the Company realized it would struggle to reach its free cash flow targets (which were set expecting annual billings), the Company reverted to discounts for multi-year, upfront billings, as well as other actions, to accelerate free cash flow. ***The Company continued to report these free cash flow results with multi-year, upfront billings while explicitly and implicitly leading shareholders to believe they had moved enterprise customers to annual billings***.

175. The same day Starboard published its letter, it commenced litigation in the Chancery Court of Delaware to force a proper election of Board directors and, consequently, to ensure better oversight of the Company's executives.

176. Thereafter, on August 16, 2024, *Bloomberg* published an article titled, "Autodesk Executives Ignored Accounting Risks, Documents Show." The article reported that, "according to previously unreported internal documents," the Company continued to pursue upfront EBA deals "in an effort to meet financial targets" and "counted on the upfront payments to boost cash flow[.]" Moreover, "[e]mployees warned executives about the strategic risk in early 2022, but the company continued to book such deals at least until the fiscal year ending in January 2024." The documents also showed "[e]mployees considered the practice risky because the discounts

and other concessions reduced long-term revenue, boosted the chance of mistakes in financial modeling and made it harder for salespeople to do their jobs[.]" Finally, the article reported that, according to the documents: "Some of the deals were approved by Chief Operating Officer Steve Blum[.]"

## X. DEFENDANTS' ILLICIT INSIDER SALES

177. During the Relevant Period, as Defendants promoted the Company's stock through false and misleading statements, Defendants Anagnost, Clifford, McDowell, Norrington, Rafael, and Smith (the "Insider Selling Defendants") capitalized on the artificially inflated stock price by selling portions of their holdings of their Autodesk common stock.

178. Specifically, during the Relevant Period, the Insider Selling Defendants collectively sold over 110,000 shares of Autodesk stock for proceeds of approximately $26.4 million. The sales made by the Selling Defendants during the Relevant Period were suspicious in timing and amount and were inconsistent with their pre- and post-Relevant Period trading practices.

179. Defendant Anagnost sold 43,371 shares of Company stock during the Relevant Period, for total proceeds of approximately $10,447,265:

| Date | Number of Shares | Average Price/Share | Proceeds |
|---|---|---|---|
| September 1, 2023 | 22,318 | $222.59 | $4,967,696 |
| March 27, 2024 | 21,053 | $260.27 | $5,479,569 |

180. Defendant Clifford sold 5,553 shares of Company stock during the Relevant Period, for total proceeds of approximately $1,445,612:

| Date | Number of Shares | Average Price/Share | Proceeds |
|---|---|---|---|
| March 27, 2024 | 5,553 | $260.33 | $1,445,612 |

181. Defendant McDowell sold 14,356 shares of Company stock during the Relevant Period, for total proceeds of approximately $3,578,686:

| Date | Number of Shares | Average Price/Share | Proceeds |
|---|---|---|---|
| August 31, 2023 | 4,656 | $222.04 | $1,033,818 |
| December 13, 2023 | 550 | $228.99 | $125,944 |
| January 16, 2024 | 550 | $240.28 | $132,154 |
| January 22, 2024 | 2500 | $250.00 | $625,000 |
| February 15, 2024 | 550 | $264.74 | $145,607 |
| March 1, 2024 | 5000 | $275.00 | $1,375,000 |
| March 15, 2024 | 550 | $256.66 | $141,163 |

182. Defendant Norrington sold 2,148 shares of Company stock during the Relevant Period, for total proceeds of approximately $450,457:

| Date | Number of Shares | Average Price/Share | Proceeds |
|---|---|---|---|
| September 29, 2023 | 2,148 | $209.71 | $450,457 |

183. Defendant Rafael sold 2,168 shares of Company stock during the Relevant Period, for total proceeds of approximately $450,889:

| Date | Number of Shares | Average Price/Share | Proceeds |
|---|---|---|---|
| June 1, 2023 | 309 | $199.21 | $61,556 |
| July 3, 2023 | 309 | $203.00 | $62,727 |
| August 1, 2023 | 309 | $211.17 | $65,251 |
| September 1, 2023 | 309 | $224.07 | $69,237 |
| October 2, 2023 | 309 | $206.06 | $63,672 |
| November 1, 2023 | 309 | $198.12 | $61,219 |
| December 1, 2023 | 308 | $218.27 | $67,227 |

184. Defendant Smith sold 42,554 shares of Company stock during the Relevant Period, for total proceeds of approximately $10,113,186:

| Date | Number of Shares | Average Price/Share | Proceeds |
|---|---|---|---|
| December 11, 2023 | 5,000 | $228.00 | $1,140,000 |
| December 13, 2023 | 10,000 | $234.00 | $2,340,010 |
| December 14, 2023 | 15,000 | $238.00 | $3,570,000 |
| December 22, 2023 | 5,000 | $244.00 | $1,220,000 |
| January 19, 2024 | 7,554 | $244.00 | $1,843,176 |

## XI. DAMAGES TO THE COMPANY

185. Autodesk has been, and will continue to be, severely damaged and injured by the Defendants' misconduct. As a direct and proximate result of the Defendants' conduct, Autodesk has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a. costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

b. substantial loss of market capital;

c. costs already incurred and to be incurred defending the pending securities fraud class action lawsuit captioned *Barkasi v. Autodesk, Inc., et al.*, Case No. 4:24-cv-02431-YGR (N.D. Cal.); and

d. any fines or other liability resulting from the Company's violations of federal law.

186. In addition, Autodesk's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired. The credibility and motives of management are now in serious doubt.

187. The wrongdoing complained of herein has irreparably damaged Autodesk's corporate image and goodwill. For at least the foreseeable future, Autodesk will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Autodesk's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## XII. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

188. Plaintiff brings this action derivatively in the right and for the benefit of Autodesk to redress injuries suffered, and to be suffered, by Autodesk as a direct result of violations of federal securities laws by the Defendants. Autodesk is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

189. The Board of Autodesk, at the time this action was commenced, consisted of Defendants Anagnost, Blasing, French, Howard, Irving, McDowell, Milligan, Norrington, Rafael, Rahim, and Smith, and related party non-defendants Cahill and Krishnan, a total of thirteen (13) individuals.

190. Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Autodesk Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

191. Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

192. Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to Defendant Anagnost Because of His**
**<u>Principal Professional Occupation as the Company's CEO and President</u>**

193. Defendant Anagnost assumed the positions of the Company's CEO and President in June 2017. Defendant Anagnost is also a member of the Board. As such, it is reasonable to infer that due to the importance of the Company's billing model to its free cash flow targets (a metric held in high regard by investors), Defendant Anagnost would have been aware of the Company's efforts to continue to pursue the "upfront" billing model in EBA deals in FY23, contrary to what it had disclosed to the public, and its inclusion of those deals in the reported free cash flows.

194. In his role as CEO of the Company in fiscal years 2023 and 2024, Defendant Anagnost received $17,600,752 and $20,649,951 in total compensation, respectively. The Company does not claim that Defendant Anagnost is an independent director and because his primary source of income and primary employment is his employment as President and CEO of Autodesk and his professional reputation is inextricably bound to his role at Autodesk Defendant Anagnost is incapable of acting independently and demand is futile upon him.

195. Additionally, Defendant Anagnost is named as a defendant in the pending Related Securities Action. Accordingly, he is incapable of considering a demand to commence and vigorously prosecute the claims asserted in this Action with the required independence and disinterest.

**Demand is Futile as to Audit Committee Defendants**

196. Demand is futile as to Defendants Howard, Blasing, French, and Milligan (the "Audit Committee Defendants") as members of the Audit Committee for their knowing failure to fulfill their responsibilities.

197. The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee. The duties of the Audit Committee are set forth herein, *supra*.

198. Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

199. The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning the Company's utilization of the upfront billing model, specifically, information concerning the Company's pursuit of upfront billing sales contrary to their public statements. In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to the Insider Selling Board Members**

200. Making a demand on Defendants Anagnost, McDowell, Norrington, Rafael, and Smith (the "Insider Selling Board Members") would be a futile and useless act as those defendants directly benefitted from the wrongs and acts complained of herein and face a sufficiently substantial likelihood of liability in connection with their insider illicit stock sales detailed above and cannot possibly consider a demand to sue themselves based on those transactions in which they reaped significant benefits.

201. The Insider Selling Board Members made such illicit trades during the Relevant Period by wrongfully benefitting from the Company's artificially inflated stock price at the expense of the Company's shareholders. Throughout the Relevant Period, Defendants misled the investing public regarding the true business prospects of the Company. When the truth finally emerged, the Company's stock plummeted, but only after the Insider Selling Board Members had substantially benefitted by selling significant portions of their stock at higher prices.

202. Specifically, during the Relevant Period the above-named Insider Selling Board Members sold significant portions of their Autodesk stock, reaping millions of dollars in proceeds.

203. The Company has adopted an Insider Trading Compliance Policy (the "Insider Policy") to provide guidance with respect to the trading of the Company's securities. The Insider Policy provides that all persons covered under the policy cannot trade while in possession of inside information, including officers and directors of the Company.

204. As a result, the Insider Selling Board Members have violated the Company's Insider Trading Compliance Policy and face a sufficiently substantial likelihood of liability due to their illicit trades, rendering them interested in considering demand.

**Demand is Futile as to the Director Defendants**

205. Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

206. Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

207. Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC

throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

208. Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

**COUNT I**

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

209. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

210. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

211. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

212. Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose to the investors the: (i) the Company was actually still pursuing the upfront billing model for EBA deals in FY 2023, contrary to public statements; (ii) the Company was utilizing the revenue from these hidden upfront deals in calculating its free cash flow, a metric of particular importance to investors; (iii) as a result of the foregoing, the financial strength of the Company was less appealing than claimed; (iv) accordingly, Autodesk's commercial and financial prospects were overstated; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times. Furthermore, the 2023 Proxy Statement falsely represented that the board was conducting appropriate risk oversight.

213. The 2023 Proxy Statement was also materially misleading because the facts show that the Board and its committees utterly failed to implement controls to effectively oversee conduct risk relating to the Company's core business, operations and prospects in relation to the conduct alleged herein.

214. The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the re-election of the Company's directors.

215. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

216. Plaintiff, on behalf of Autodesk has no adequate remedy at law.

## COUNT II

**Against the Securities Action Defendants**
**for Contribution Under Section 10(b) of the Exchange Act,**
**Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

217. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

218. As a result of the conduct and events alleged above, Autodesk has been named as a defendant in the Related Securities Action brought on behalf of Autodesk shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

219. Federal law provides Autodesk with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Autodesk has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Autodesk to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action and sets forth specific rules regarding the determination of claims for such contribution.

220. Accordingly, Plaintiff, on behalf of Autodesk, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Autodesk under Rule 10b-5, or if joined in such actions, would be liable for the same damage as Autodesk.

221. Autodesk claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Securities Action Defendants**

222. Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects. These statements were materially misleading to persons who purchased Autodesk securities during the Relevant Period.

223. The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Autodesk securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

224. The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

225. The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

226. When the Securities Action Defendants signed off on or made the false and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged in detail herein, due to their positions as employees and/or directors of Autodesk, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

227. Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Autodesk were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on behalf of Autodesk.

**Allegations Regarding the Securities Action Defendants as Control Persons**

228. In acting as alleged above, the Securities Action Defendants were acting as authorized agents of Autodesk in their roles as directors and/or employees. Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were, able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

229. The Securities Action Defendants were "controlling persons" of Autodesk within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action. Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

230. Plaintiff hereby derivatively claims such right of contribution on behalf of Autodesk.

**COUNT III**

**Against the Individual Defendants for Breaches of Fiduciary Duty**

231. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

232. The Individual Defendants owed and owe Autodesk fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Autodesk the highest obligation of good faith, loyalty, and due care.

233. The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Autodesk shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period. These actions could not have been a good faith exercise of prudent business judgment.

234. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Autodesk to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Autodesk and its shareholders. As a result, the Individual Defendants grossly mismanaged the Company.

235. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

236. Plaintiff, on behalf of Autodesk, has no adequate remedy at law.

## COUNT IV

**Against the Insider Selling Defendants for Breach**
**of Fiduciary Duty for Insider Selling and Misappropriation of Information**

237. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully det forth herein.

238. The Insider Selling Defendants (defined *supra*), throughout the Relevant Period, engaged in the sale of the Company stock at artificially inflated prices while in possession of material information that had yet to be released to the investing public. The Insider Selling Defendants engaged in this course of conduct to keep the public unaware of the adverse information affecting the Company's stock price and benefited to the detriment of the investing public and the Company itself.

239. This proprietary, non-public information concerning the Company's business and prospects was known by the Insider Selling Defendants, who sold substantial amounts of their shares of Autodesk stock during the period Defendants' fraud was ongoing. These sales were made for Defendants own self-interests, at the expense of Autodesk and the investing public.

240. By selling the Company's common stock while in possession of this information and failing to fully inform the investing public, the Insider Selling Defendants breached their fiduciary duties of good faith and loyalty to the Company.

241. As such, the Insider Selling Defendants are legally responsible to the Company for the significant profits they received from the sales of their stock in Autodesk.

**COUNT V**

**Against all the Individual Defendants for Unjust Enrichment**

242. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

243. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Autodesk.

244. The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Autodesk.

245. Plaintiff, as a shareholder and representative of Autodesk, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

246. Plaintiff, on behalf of Autodesk, has no adequate remedy at law.

**COUNT VI**

**Against the Individual Defendants for Abuse of Control**

247. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

248. The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of Autodesk and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the reporting of the Company's financials and lack of related internal control.

249. As such, the Individual Defendants have abused their positions of control with the Company and are legally responsible.

250. Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

**COUNT VII**

**Against the Individual Defendants for Gross Mismanagement**

251. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

252. The Individual Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company. Furthermore, the Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

253. Through the wrongful acts complained of herein, the Individual Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

254. By committing the misconduct alleged herein, the Individual Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of Autodesk's affairs and in the use and preservation of Autodesk's assets.

255. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Autodesk to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to Autodesk, thus breaching their duties to the Company.

256. As a result, the Individual Defendants grossly mismanaged Autodesk and should be liable to the Company for the resulting damages.

**COUNT VIII**

**<u>Against the Individual Defendants for Waste of Corporate Assets</u>**

257. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

258. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

259. As a result of the misconduct described above, the Individual Defendants wasted corporate assets, by, among other things: (a) paying excessive compensation and bonuses to certain executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against Related Securities Action.

260. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

261. Plaintiff, on behalf of the Company, has no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Autodesk and that Plaintiff is an adequate representative of the Company;

B. Determining and awarding to Autodesk the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C. Directing Autodesk and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Autodesk and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for

shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

(1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D. Determining and awarding to Autodesk exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E. Awarding Autodesk restitution from Defendants, and each of them;

F. Awarding Autodesk contribution from the Securities Action Defendants, and each of them:

G. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H. Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: February 14, 2025

Respectfully submitted,

*/s/ Ryan M. Ernst*

**BIELLI & KLAUDER, LLC**
Ryan M. Ernst, Esq. (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Main: (302) 803-4600
Direct: (302) 321-5411
rernst@bk-legal.com

*Attorneys for Plaintiffs*

**OF COUNSEL:**

**LIFSHITZ LAW PLLC**
Joshua M. Lifshitz
1190 Broadway
Hewlett, NY 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376
jlifshitz@lifshitzlaw.com